**SCHLEIER LAW OFFICES, P.C.**
428 E. Thunderbird Road, PMB 541
Phoenix, Arizona 85022
Telephone: (602) 277-0157
Facsimile: (602) 654-3790
BRADLEY H. SCHLEIER, ESQ.  #011696
Email: brad@schleierlaw.com
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Tolulope Ramos, MD, a single woman, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Banner-University Medical Group; an Arizona corporation; Michael McKee, MD, a married man; Norman Chutkan, MD, a married man; J. Brock Walker, MD, a married man; and Niloofar Dehghan, MD, a married woman; | **(Demand for Jury Trial)** |
| Defendants. | |

Plaintiff Tolulope Ramos, M.D. (hereinafter "Dr. Ramos"), by and through counsel, for her Complaint against Defendants Banner-University Medical Group, Michael McKee, MD, Norman Chutkan, MD, J. Brock Walker, MD and Niloofar Dehghan, MD alleges as follows:

**I. NATURE OF CLAIM**

1. This is a proceeding for damages against Defendant Banner-University Medical Group (hereinafter "Defendant Banner"), Michael McKee, MD, Norman Chutkan, MD, J. Brock Walker, MD and Niloofar Dehghan, MD (hereinafter collectively known as "Defendant Doctors") for violation of the Civil Rights Act of 1871, 42 U.S.C. §1983 and the Civil Rights Act of 1866, 42 U.S.C. §1981 to redress the discrimination hostile work environment and retaliation resulting in a constructive discharge.

## II. JURISDICTION

2. The jurisdiction of this Court is invoked pursuant to the Court's federal question jurisdiction under 28 U.S.C. §§1331.

## III. VENUE

3. Based on 28 U.S.C. § 1391(b), venue is proper because the acts detailed in this Complaint arise within the State of Arizona and the jurisdiction of this Court.

## IV. PARTIES

4. Plaintiff Tolulope Ramos, MD ("Plaintiff" or "Dr. Ramos") is a black, single woman who was a Graduate Medical Education Resident Fellow employed by Defendant Banner pursuant to the Fellow Employment Agreement. Plaintiff was an "employee" of Defendant Banner.

5. The Graduate Medical Education Residency ("Residency Program") was sponsored and managed by the University of Arizona. The University is a public entity managed by the Arizona Board of Regents.

6. Defendant Banner is an Arizona corporation whose home office and principal place of business is Maricopa County, Arizona. Defendant Doctors, at all times, were employees of Defendant Banner, each of whom acted within the course and scope of their employment and official capacity with Defendant Banner and/or on behalf of their marital community.

7. The University of Arizona and Banner were joint employers of Dr. Ramos.

8. Defendant Michael McKee, MD is a married man. He is an employee of Defendant Banner and employed as the Chairman of the Residency Program on behalf of the University of Arizona. Consequently, his actions were made on behalf of his marital community as well as under the color of law.

9. Defendant Norman Chutkan, MD, is a married man and an employee of Defendant Banner and employed as the Program Director Chairman of the Residency

2

Program on behalf of the University of Arizona. Consequently, his actions were also made under the color of law.

10. Defendant J. Brock Walker, MD, is a married man and an employee of Defendant Banner and employed as the Trauma Attending Physician of the Residency Program on behalf of the University of Arizona. Consequently, his actions were also made under the color of law.

11. Defendant Niloofar Dehghan, MD is a married woman and an employee of Defendant Banner and employed as the Chief of Trauma for the Residency Program on behalf of the University of Arizona. Consequently, her actions were also made under the color of law.

12. Defendants McKee, Chutkan, Walker, and Dehghan are collectively referred to as Defendant Doctors.

13. Defendant Doctors, at all times, were employees of Defendant Banner, each of whom acted within the course and scope of their employment and official capacity with Defendant Banner and/or on behalf of their marital community. Defendant Doctors were also acting on behalf of the State of Arizona through their roles with the University of Arizona Residency Program.

## V. FACTUAL ALLEGATIONS

14. Plaintiff signed an Employment Agreement with Defendant Banner to begin the Graduate Medical Education Residency Program (hereinafter "Program") on June 13, 2022. It was the first year of Dr. Ramos' residency, commonly referred to as PGY-1. The Program is designed to be an instructional basis, and residents are encouraged to seek answers to medical questions. Dr. Ramos was the first black woman in the Program.

15. Prior to signing the Employment Agreement with Defendant Banner, Dr. Ramos served five years in the United States Navy before obtaining her undergraduate degree from University of Nevada Las Vegas as well as her Masters and medical degrees from Tulane University.

16. Beginning on Dr. Ramos' first day of employment, July 1, 2022, she was treated differently, bullied and harassed by other residents and leadership, including Defendant Doctors. Despite repeated complaints, Defendant Doctors failed to take any action to stop the bullying and harassment.

17. Specifically, third-year resident Jaynyne Mallender, MD, asked Dr. Ramos to mark an error in a patient's chart even though Dr. Ramos had not treated the patient. Dr. Ramos refused to use her own electronic medical record ("EMR") to change the patient records and note the error since she had not treated the patient. Dr. Mallender raised her voice about Dr. Ramos' refusal to correct the record and stated Dr. Ramos should not question her. Dr. Ramos made the correction to the patient's chart adding it was made at the direction of the senior resident.

18. Dr. Ramos was asked on a number of occasions to share her EMR password (despite being told during orientation not to share it) and when she expressed her unwillingness to do so she was informed that her refusal would reflect negatively among other residents and staff.

19. On another occasion when working with Dr. Mallender on a patient with a knee problem, Dr. Mallender stated to Dr. Ramos "you came into this program acting like you're the shit, but you're nothing and don't know anything. You need to humble yourself."

20. Subsequently, the Chief Resident contacted Dr. Ramos by phone on her day off. The Chief Resident's conversation tone was aggressive and insistent that Dr. Ramos needed to admit she was a "liar."

21. On August 2, 2022, Dr. Ramos met with Program Director Defendant Dr. Norman Chutkan. Dr. Chutkan stated that residency and orthopaedic surgery were difficult but not to give up. Dr. Ramos discussed her inability to fit in and that she was being subjected to a hostile work environment. Dr. Ramos stated she was being bullied and ostracized.

22. The next day, Dr. Ramos spoke with a junior attending physician who confirmed that senior residents did not want to work with Dr. Ramos and again brought up the issue of not sharing her EMR password.

23. For the months of August and September 2022, Dr. Ramos was off service and thus rarely at the hospital. In September, Dr. Ramos performed services at Phoenix Children's Hospital and received positive performance reviews.

24. In October 2022, as Dr. Ramos began her General Surgery Rotation, she began to experience significant issues with her pre-existing irritable bowel syndrome ("IBS"). At times Dr. Ramos' symptoms became urgent and she was required to take occasional breaks.

25. On October 15, 2022, Dr. Ramos again met with Dr. Chutkan about continued negative comments and hostile treatment. Dr. Ramos expressed that she was unwelcome and unwanted, especially by residents who were not of color. Dr. Chutkan suggested a meeting to also include the Program Coordinator Susan Reddell.

26. On December 5, 2022, Dr. Ramos received positive feedback on her performance from Senior Resident Cina Darodeh, MD and Third-Year Resident Bridget Ralston Ripple, MD.

27. Three days later, Dr. Ripple suddenly stated she was unhappy with Dr. Ramos' performance and that she had a "list" of complaints against Dr. Ramos. Dr. Ripple was unwilling to share the details of the complaints or the list with Dr. Ramos.

28. That same day, Dr. Ramos received an email from Program Coordinator Susan Reddell asking Dr. Ramos to meet with Dr. Chutkan the following week.

29. The next week, Dr. Ramos was experiencing an acute flare-up of her IBS symptoms and had to rush to the bathroom on several occasions during her workday. Dr. Ripple accused Dr. Ramos of appearing to be angry and aggravated and stated she did not like Dr. Ramos' "attitude" right now.

30. Another resident informed Dr. Ramos that a "list" had been provided to Dr. Chutkan from Dr. Ripple and that he had been asked to add his complaints to the list, which

he declined. The resident stated the "list" was an effort to get Dr. Ramos terminated from the Program.

31. On December 23, 2022 during a 6-month progress meeting, Dr. Ramos was informed she would have to go back on trauma rotation as a non-disciplinary action for her alleged poor performance in December.

32. In January 2023, Dr. Ramos was again warned by a resident to be careful about some residents, that Program leadership was looking to terminate her and had been asking other residents if Dr. Ramos should be terminated. The resident further stated that the treatment was due to the fact that Dr. Ramos was "a black woman and the first in the Program, but no one will stand up for you because we all have our careers to worry about."

33. In accordance with the House Staff Manual and other policies of Defendant Banner, Dr. Ramos spoke with attending physician Defendant J. Brock Walker, MD. Dr. Ramos informed Dr. Walker about the conversations with the resident noted above.

34. In a separate meeting with Dr. Chutkan, Dr. Ramos again expressed her concerns of being unwelcome and that she suspected Program leadership was trying to terminate her. Dr. Ramos reported such discriminatory and retaliatory conduct based on the requirements of House Staff Manual of Defendant Banner which Dr. Ramos was required to follow.

35. In early February 2023, two incidents occurred regarding patient care with resident Victoria Greenstein, MD. In one instance, Dr. Greenstein failed or forgot to place a new splint on a patient and blamed Dr. Ramos for the error even though Dr. Greenstein failed to sign off on the procedure for another male resident.

36. Having seen 17 patients over that night, the next morning Dr. Greenstein asked Dr. Ramos to do rounds on some of Dr. Greenstein's patients. Dr. Ramos agreed to provide assistance and when Dr. Ramos asked for the pager, Dr. Greenstein threw it at and hit Dr. Ramos.

37. On February 6, 2023, Dr. Walker called Dr. Ramos into his office and asked about why one patient's notes had been written so late. Dr. Ramos explained that she had conducted the rounds for Dr. Greenstein because she was exhausted and overwhelmed after a busy night schedule. Dr. Walker expressed his disbelief in Dr. Ramos' explanation. Dr. Ramos showed Dr. Walker the text from Dr. Greenstein asking for assistance with the rounds.

38. On February 9, 2023, Dr. Ramos experienced four late-day emergency orthopaedic consults. While working up treatment plans and confirming such plans with Dr. Walker and performing such treatments, Dr. Ramos was called for the next consult. Before Dr. Ramos could obtain confirmation for treatment, perform the treatments and send the patient to surgery, Dr. Walker yelled at Dr. Ramos saying such incidents do not happen with other residents and that she was "a problem."

39. The next day, Dr. Ramos spoke with Dr. Walker and expressed her feelings of being excluded, harassed and targeted. When Dr. Ramos refused to turn over her cell phone to Dr. Walker claiming privacy about a harsh text message, Dr. Walker stated he would report Dr. Ramos to the Program Director for what he perceived to be a lack of integrity and pretending to be targeted.

40. Also on February 10, 2023, Dr. Greenstein told Dr. Ramos that Dr. Ramos was "under the microscope and have to work twice or even four times as hard" and that "we all have to eat shit, but you, more than anyone else have to eat the most shit."

41. In mid-February, Dr. Ramos again met with Dr. Chutkan about the racial discrimination she had been experiencing. Due to concerns of experiencing further retaliation, and not obtaining any support for prior reports, Dr. Ramos declined to speak to other Program leadership about the continuing discriminatory and retaliatory actions taken against her.

42. By the end of February 2023, Dr. Ramos was informed the general consensus was that she was performing well. During the period March and April 2023, Dr. Ramos received positive feedback during her vascular surgery and trauma rotations.

43. Dr. Ramos met with Human Resources and Dr. Cheryl O'Malley to discuss the discrimination and retaliation she had experienced since joining the Program. This report is also required under Defendant Banner's own policies. Because she feared additional retaliation, Dr. Ramos asked to withdraw her concerns. Human Resources denied that request and informed Dr. Ramos that the Program had to be contacted and an investigation conducted according to policy.

44. On March 15, 2023, during a meeting with Dr. Chutkan, Dr. Ramos was informed that the Caucasian colleagues were having trouble "relating" to her, that she was guarded and reserved, and that "white people need to be able to relate to you and right now they feel like they can't."

45. On May 1, 2023, Dr. Ramos was notified that Human Resources had concluded its investigation into her concerns of discrimination and retaliation. Human Resources determined there was no discrimination.

46. The next day, Defendant Michael McKee, MD presented Dr. Ramos with a poor performance evaluation stating she was dangerous to patients and would have to repeat the rotation. Dr. Ramos had not been provided any feedback during the rotation about any issues outlined in the performance evaluation.

47. Due to this retaliatory behavior, Dr. Ramos again contacted Human Resources.

48. On May 17, 2023, Dr. Chutkan informed Dr. Ramos that she had been performing poorly all year, she was not on probation, but that they would meet again in a week.

49. The next week, Defendant Dr. Dehghan informed Dr. Ramos that the Program's plan was to retain her at PGY-1 level (essentially demoting her and repeating the first year) and she would be on probation. Dr. Chutkan memorialized the requirement.

50. Dr. Ramos attempted to appeal the decision, but that was denied.

51. Due to the hostile environment, discrimination and retaliation suffered by Dr. Ramos, as well as being asked to repeat the PGY-1, the work environment was so intolerable

8

and she could no longer stay employed by Defendant Banner and the University of Arizona. Dr. Ramos was therefore constructively discharged from her position with Defendant Banner and the University of Arizona Residency Program when the program placed her on probation and refused to promote her to PGY-2.

## COUNT ONE

## VIOLATION OF §1981 – DEFENDANT BANNER

52. Dr. Ramos incorporates all preceding paragraphs into this Count by reference as fully stated herein.

53. Dr. Ramos is a black woman and was employed by Defendant Banner during her PGY-1 year until her constructive termination of her employment due to the harassing and hostile work environment, as well as being asked to repeat her first year.

54. Dr. Ramos was subjected to ongoing and intentional discrimination because of her race, including but not limited to harassment, bullying, and disparate treatment compared to her non-black colleagues as discussed herein.

55. Defendant Banner's discriminatory actions altered the terms and conditions of Dr. Ramos' employment and created a hostile and intolerable work environment in violation of 42 U.S.C. §1981.

56. Defendant Banner treated similarly situated employees outside of Dr. Ramos' protected class more favorably under comparable circumstances, including her reviews and being asked to repeat her PGY-1 year.

57. Due to the persistent discriminatory conduct and hostile work environment, a reasonable person in Dr. Ramos' position would have felt compelled to resign.

58. Dr. Ramos' resignation constituted a constructive discharge, proximately caused by Defendant Banner and its employees' discriminatory conduct based on her race and violative of 42 U.S.C. §1981.

59. As a direct result of Defendant Banner's conduct, Dr. Ramos has sustained and continues to sustain damages in the form of lost wages and the value of benefits.

60. As a direct result of Defendant Banner's unlawful conduct, Dr. Ramos has sustained emotional distress, anxiety, depression, and loss of professional standing, thereby entitling her to an award of compensatory damages.

61. Defendant Banner's conduct is willful and in dereliction of Dr. Ramos' federally protected rights, thereby entitling Plaintiff to punitive damages.

## COUNT TWO

## VIOLATION OF §1983 – DEFENDANT DOCTORS

62. Dr. Ramos incorporates all preceding paragraphs into this Count by reference as fully stated herein.

63. Defendant Doctors' actions were done under the color of law.

64. Individuals have a clear right, protected by the Fourteenth Amendment, to be free from discrimination on the basis of race in public employment. *See Davis v. Passman,* 442 U.S. 228, 234–35, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).

65. Defendant Doctors violated Dr. Ramos' Fourteenth Amendment right to be free from discrimination on the basis of race in their public employment with the University of Arizona in managing the Residency Program when they permitted Dr. Ramos to be subjected hostile environment due to her race and then subjected her to a discriminatory treatment which eventually resulted in Dr. Ramos' constructive termination.

66. Defendant Doctors participated in, directed, set in motion, acquiesced in, were complicit in, were consulted about, knew of, ratified or approved the reviews and decision to require Dr. Ramos to repeat the first year of her residency which led to Dr. Ramos being constructively discharged which resulted in the deprivation of Dr. Ramos' constitutional rights of freedom from race discrimination guaranteed by the Fourteenth Amendment.

67. Defendant Doctors' actions violated 42 U.S.C. §1983.

68. As a direct and proximate result of Defendant Doctors' violation of Plaintiff's constitutional rights, she has suffered economic loss, mental and emotional

distress and damage to her professional reputation, entitling her to recover damages in amounts to be determined at trial.

69. In committing the acts alleged above, Defendant Doctors, in their individual capacity, acted maliciously and/or was guilty of a wanton and reckless disregard of Dr. Ramos' constitutional rights, and by reason thereof, Dr. Ramos is entitled to exemplary and punitive damages in an amount to be proven at trial.

WHEREFORE, Plaintiff demands judgment against Defendants and each of them as follows:

1. General and Special damages be awarded to Plaintiff and against Defendants in amounts to be proven at trial;
2. Compensatory damages be awarded to Plaintiff and against Defendants in amounts to be proven at trial;
3. Punitive or exemplary damages at an amount to be proven at trial;
4. Plaintiff be awarded her attorneys' fees pursuant to 42 U.S.C. §1988;
5. Plaintiff be awarded her costs; and
6. Plaintiff be awarded all other relief that this Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

DATED this 17th day of May 2025.

SCHLEIER LAW OFFICES, P.C.
 /s/Bradley H. Schleier
Bradley H. Schleier
Attorney for Plaintiff